IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN HENRY CRAFT, | 2:07-cv-01484-RCT |
| Petitioner, | |
| vs. | |
| JAMES YATES, et al., | |
| Respondents. | <u>MEMORANDUM DECISION<br>AND ORDER</u> |

This matter comes before the court on John Henry Craft's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

<u>INTRODUCTION</u>

Petitioner Craft is a state prisoner currently incarcerated at Pleasant Valley State Prison, Coalinga, California. He filed this petition for a writ of habeas corpus to challenge a judgment of conviction entered against him in the San Joaquin County Superior Court in 2003 for second degree robbery and elder abuse. A review of the petition shows that at least one of Craft's claims is procedurally barred, and that the California courts correctly applied United States Supreme Court law in rejecting his remaining eyewitness identification claims. 28 U.S.C. § 2254(d). Accordingly, the petition is dismissed in part and denied in part, and the case is dismissed with prejudice.

## PROCEDURAL AND FACTUAL HISTORY

Craft, who has previously suffered six felony convictions, filed this petition for writ of habeas corpus to challenge his latest San Joaquin County Superior Court convictions and resulting sentence of 35 years to life in prison.

The California Court of Appeal summarized the facts of this case as follows:

> On July 31, 2003, Acosta Bolivar,[1] 73 years old, went to his cardiologist at 2800 North California Street, Stockton, for a pacemaker checkup. Bolivar signed in and asked for a key to a one-person bathroom on the first floor. Upon entering the bathroom, Bolivar closed the door, put aside his cane and coat, removed his glasses and put them on the sink, and started to wash. At that time, someone knocked on the door, and Bolivar opened it to find a man who "acted like he was going to go and—and urinate. One or two seconds after entering the bathroom, the man grabbed Bolivar from behind, put his hand over Bolivar's mouth, threw Bolivar on the floor, and took Bolivar's watch and $240 from his wallet. While in the bathroom, the perpetrator was constantly moving and said, "Give me the money" and "No talking."
> Bolivar testified that he could not see his assailant's face when the man grabbed him, but he did see the man's face when the man entered the bathroom. He also testified that he uses glasses for reading and that he cannot see long distances "too good" without them. Nevertheless, he indicated he could clearly see the defense attorney standing behind counsel table at trial.
> While passing the bathroom at the time of the incident, Yobana Campuzano, who works in the building, heard sounds like muffled screams coming out of the bathroom. Yobana knocked on the door of the bathroom, and after getting no response she ran upstairs to get her sister, Lillian. As they were approaching the last two steps of the stairs on the way down, a black male came out of the bathroom and walked outside to the parking lot. When they heard the noise of the opening door, Yobana said, "Oh, someone's coming out." While exiting the bathroom, the man made eye contact with both Yobana and Lillian, who were at that time standing on the last two steps of the stairs.
> As the man walked toward the exit, Yobana and Lillian knocked on the bathroom door. When Bolivar opened the door, he was on his knees, and he told them he had been robbed. While Yobana stayed with Bolivar, Lillian ran outside where she saw the man who had left the bathroom in the parking lot; then he walked behind the Alpine Market in a loading dock type area, where he stayed for 5 to 10 minutes. She did not see him leave from behind the Alpine Market because she looked away and when she looked back he was gone.
> When the police arrived, despite Bolivar's objection that he wanted to stay and see his cardiologist, the police took him to St. Joseph's Medical Center. At that time, Bolivar had red marks on his hand from scratches and he was bleeding from his forehead above his eyebrow.
> While Bolivar was at the hospital, defendant, who fit a description given to the police, was found hiding behind some bushes in a backyard with Bolivar's watch and $137 in his right front pocket. Almost immediately after the police

---

[1] The California Court of Appeal mistakenly transposed the victim's first and last names. Unless quoting from the state court's disposition, this Court will refer to the victim as Bolivar Acosta. (*See* Lodged Doc. No. 13 at 145; Lodged Doc. No. 15 at 252.)

>pulled him from the bushes, defendant started talking, saying he did not rob anybody, that he was just waiting in his car, and some guy ran by and threw a bunch of stuff in his car. Defendant said that after seeing unmarked police cars, he decided to run because he figured they would arrest him just because he was on parole.
>  After the arrest, the police brought defendant to the hospital for a one-person showup because Bolivar was elderly, assaulted, and in the hospital, and the police officers did not want to cause any more duress by bringing him to the scene for the showup. At the one-person showup, Bolivar identified defendant as his assailant. The next day, the Campuzanos each picked defendant out of a photographic lineup as the perpetrator.
>  Before trial, defendant moved to exclude the out-of-court identifications by Bolivar and the Campuzanos as unduly suggestive. The trial court denied the motion. Subsequently, at trial, the Campuzanos identified defendant as the person coming out of the bathroom, and Bolivar identified him as the assailant.

(Lodged Doc. No. 4 at 2–4 (internal footnote omitted).)

Craft was convicted by a jury of robbery in the second degree in violation of section 211 and of elder abuse in violation of section 368(b)(1) of the California Penal Code. (Lodged Doc. No. 15 at 624.) After Craft waived his right to a jury trial on the matter of determining which prior convictions counted for enhancing his sentence, the trial court found that he had previously been convicted of six serious felonies. (*Id.* at 639–40.) The trial court then sentenced Craft to an aggregate term of thirty-five years to life in prison. (*Id.* at 660.)

Craft appealed his convictions and sentence to the California Court of Appeal, Third Appellate District, raising two of the claims presented here: Claim Two (failure to exclude the victim's showup identification) and Claim Three (failure to exclude the Campuzano sisters' photographic lineup identification). (Lodged Doc. No. 1.) In an unpublished decision, the Court of Appeal affirmed the superior court's judgment on June 21, 2005. (Lodged Doc. No. 4 at 19.) Craft thereafter filed a petition for review in the California Supreme Court, which was denied on August 31, 2005, without comment or citation to authority. (Lodged Doc. Nos. 5, 6.)

On February 23, 2006, Craft filed a petition for a writ of habeas corpus with the California Supreme Court raising the allegedly tainted jury (Claim One) as the sole claim. (Lodged Doc. No. 9.) The California Supreme Court denied this petition on October 11, 2006, citing to *In re Dixon*, 264 P.2d 513 (Cal. 1953). (Lodged Doc. No. 10.) On November 6, 2006, Craft filed a petition for a writ of habeas corpus with the California Court of Appeal, Third Appellate District, raising as the sole claim ineffective assistance of appellate counsel (Claim

Four). (Lodged Doc. No. 7.) The Court of Appeal denied this petition on November 9, 2006, without comment or citation to authority. (Lodged Doc. No. 8.) Craft again raised this ineffective assistance claim in a habeas petition filed with the California Supreme Court on December 18, 2006. (Lodged Doc. No. 11.) The California Supreme Court denied this petition on May 16, 2007, citing to *In re Clark*, 855 P.2d 729 (Cal. 1993), and *In re Miller*, 112 P.2d 10 (Cal. 1941). (Lodged Doc. No. 12.)

On July 23, 2007, Craft filed this federal petition for a writ of habeas corpus. Respondents concede that all four claims have been fully exhausted, but argue that only two are properly before the Court.

## CLAIMS

Craft raises the following claims in his petition:

1. "Fundamental jurisdictional error" caused by the trial court's refusal to grant a mistrial based on the jury's exposure during voir dire to a prejudicial statement.

2. Denial of his right to due process when the trial court refused to exclude the victim's identifications of Craft.

3. Denial of his right to due process when the trial court refused to exclude the Campuzano sisters' identifications of Craft.

4. Denial of effective assistance of appellate counsel because his attorney failed to raise the tainted jury claim (Claim One) on direct appeal.

## LEGAL STANDARD

In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which established that a federal habeas corpus petition shall not be granted with respect to any claim adjudicated on the merits in the state courts unless the adjudication either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented to the state courts. 28 U.S.C. § 2254(d).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.

*Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court]'s decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

Under AEDPA, the federal courts review the "last reasoned decision" of the state courts. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991). A determination of a factual issue by a state court is presumed correct, and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## DISCUSSION

*I.   Claim One: Tainted Jury*

Craft alleges that the trial court committed a "fundamental jurisdictional error" in refusing to grant him a mistrial. During voir dire, a prospective juror addressed the trial court as follows: "I'm a correctional officer at Dueul Vocational Institute. I would like to speak with you in your chambers because I believe I have come in contact with Mr. Craft." (Lodged Doc. No. 16 at 331.) The trial court excused this prospective juror after confirming privately in chambers that she had indeed worked with Craft while he was incarcerated at the state correctional facility located near Tracy, California. (*Id.* at 335.) It also advised the prospective juror to be more discreet in the future, noting "how powerful a statement like that can be in front of the other jurors." (*Id.* at 335–36.) Craft's attorney sought a mistrial on the basis that the jury might infer that Craft had been incarcerated at Dueul on a previous conviction, particularly since a member of the jury was married to a Dueul employee and would therefore know that it is a correctional facility. (*Id.* at 343.)

The trial court denied the motion. (*Id.* at 345–46.) During voir dire, the trial court, at Craft's request, had revealed that Craft was then in custody. (*Id.* at 142, 166, 346.) The jury would thus likely infer not that Craft had been previously incarcerated, but rather that he was

being housed at Dueul while awaiting trial in the instant case. (*Id.* at 345–46.) However, the trial court agreed to again admonish the jury that it could not consider for any purpose the fact that Craft was in custody at the time. (*Id.* at 346.)

      *A.*     *Procedural Default*

State courts may decline to review a claim based on a procedural default. *See generally Wainwright v. Sykes*, 433 U.S. 72 (1977). As a general rule, a federal habeas court "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). A state rule must be "independent" in that it is not "interwoven with the federal law." *Park v. California*, 202 F.3d 1146, 1152 (9th Cir. 2000) (quoting *Michigan v. Long*, 463 U.S. 1032, 1040–41 (1983)). A state rule is "adequate" if it is "well-established and consistently applied." *Bennett v. Mueller*, 322 F.3d 573, 583 (9th Cir. 2003) (citing *Poland v. Stewart*, 169 F.3d 573, 577 (9th Cir. 1999)).

If the applicable state rule is independent and adequate, the claim may be reviewed by the federal court only if the petitioner can show: (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law;" or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. "'Cause' is a legitimate excuse for the default, and 'prejudice' is actual harm resulting from the alleged constitutional violation." *Thomas v. Lewis*, 945 F.2d 1119, 1123 (9th Cir. 1991). "[T]he miscarriage of justice exception is limited to those *extraordinary* cases where the petitioner asserts his innocence and establishes that the court cannot have confidence in the contrary finding of guilt." *Johnson v. Knowles*, 541 F.3d 933, 937 (9th Cir. 2008) (citing *Schlup v. Delo*, 513 U.S. 298, 317 (1995)).

In California, "[t]he general rule" under *In re Dixon* "is that habeas corpus cannot serve as a substitute for an appeal" unless the petitioner can demonstrate "special circumstances constituting an excuse for failure" to raise the alleged errors on direct appeal. 264 P.2d at 514. Four exceptions apply: (1) cases involving "fundamental constitutional error;" (2) cases where the trial court lacked personal or subject matter jurisdiction over the petitioner; (3) cases where

the trial court acted in excess of its jurisdiction; and (4) cases where there has been an intervening change in the law. *In re Harris*, 855 P.2d 391, 398–407 (Cal. 1993); *see also id.* at 395 n.3 (applying the four exceptions to the *Dixon* bar); *In re Robbins*, 959 P.2d 311, 340 n.34 (Cal. 1998) (so recognizing). In *Robbins*, the California Supreme Court announced a prospective rule that decisions as to whether the *Dixon* procedural default rule applies rest solely on state law grounds. 959 P.2d at 338–39. Thus, the *Dixon* bar now rests on state law grounds that are independent of federal law. *See Bennett*, 322 F.3d at 582–83.

Although Craft raised the tainted jury claim in a habeas petition filed with the California Supreme Court, he failed to do so on direct appeal. The California Supreme Court thus denied the claim, citing to *In re Dixon*, 264 P.2d 513 (Cal. 1953). (Lodged Doc. No. 10.) The California Court of Appeal also reviewed Craft's tainted jury claim insofar as it was the basis for his claim of ineffective assistance of appellate counsel, but denied Craft's petition without comment or citation to authority. (Lodged Doc. No. 8.)

Craft's traverse fails to address the requirements for challenging a state procedural bar on federal habeas review. Craft cites to no authority demonstrating inconsistent application of the *Dixon* procedural default rule. *See Bennett*, 322 F.3d at 585–86. Nor does he address either the cause-and-prejudice exception or the fundamental-miscarriage-of-justice exception. Admittedly, with respect to cause, Craft has also made a claim of ineffective assistance of appellate counsel. Craft does not, however, assert ineffective assistance as the cause for his procedural default; rather, he asserts his appellate counsel's failure to raise the issue of jury taint as an example of his alleged ineffective assistance. Moreover, even if Craft did argue that his procedural default was caused by ineffective assistance of appellate counsel, the argument would fail. As discussed *infra*, Craft has not established that his appellate counsel's performance was deficient under the standard of *Strickland v. Washington*, 466 U.S. 668 (1984). Therefore, the Court holds that Claim One is procedurally barred from federal review.

  B.  *Merits*

Even if the Court were to reach the merits of this claim, Craft would not prevail.

Craft argues that the potential juror's statement, made in open court, tainted the jury with

the inference that Craft had previously been convicted of a felony. He claims that the resulting bias violated his right to an impartial jury and rises to the level of structural error. Because the California Court of Appeal at best impliedly denied this claim without providing a reasoned decision, the Court must "independently review the record to determine whether the state court clearly erred in its application of Supreme Court law." *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002) (citing *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000)). "However, the independent review undertaken under *Delgado* is not the equivalent of *de novo* review, but rather is a style of review which views the state court decision through the 'objectively reasonable' lens." *Allen v. Ornoski*, 435 F.3d 946, 955 (9th Cir. 2006) (citations and internal quotation marks omitted). And even though the Court independently reviews the record, it must "still defer to the state court's ultimate decision." *Pirtle*, 313 F.3d at 1167.

The right to a jury trial established by the Sixth Amendment "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). A defendant is denied the right to an impartial jury if "only one juror is unduly biased or prejudiced." *Mach v. Stewart*, 137 F.3d 630, 633 (9th Cir. 1998) (citation omitted). Due process requires "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). In assessing a case of jury bias, "the appropriate focus" is "on the nature of the [extrinsic] information." *Jeffries v. Wood*, 114 F.3d 1484, 1490 (9th Cir. 1997), *overruled on other grounds by Lindh v. Murphy*, 521 U.S. 320 (1997).

Constitutional errors, such as denial of the right to an impartial jury, fall into one of two categories—trial errors or structural errors. *See Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993). A trial error "occurs during the presentation of the case to the jury" and can "be quantitatively assessed in the context of other evidence presented in order to determine the effect it had on the trial." *Id.* (brackets omitted). A structural error, by contrast, relates to trial mechanism and "infect[s] the entire trial process." *Id.* at 629–30; *see also Arizona v. Fulminante*, 499 U.S. 279, 309–10 (1991). Thus, if constitutional error is found, the error may

be harmless if it is not structural. *See Hedgpeth v. Pulido*, 129 S. Ct. 530, 532 (2008) (per curiam). Under the harmless error standard, relief is warranted on collateral review if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (quoting *Kotteakos v.United States*, 328 U.S. 750, 776 (1946)). Whether a jury's exposure during voir dire to a prejudicial statement constitutes trial error or structural error appears to depend on "the nature of the information and its connection to the case." *Mach*, 137 F.3d at 634 (citations omitted).

Craft relies on *Mach v. Stewart*, in which the Ninth Circuit observed, without deciding, that such a statement "arguably rises to the level of structural error." *Id.* at 633. Mach was convicted of sexual conduct with a minor based primarily on the child's testimony. *Id.* at 634. During voir dire, an experienced social worker who had taken courses in child psychology made "four separate statements that she had *never* been involved in a case in which a child accused an adult of sexual abuse where that child's statements had not been borne out." *Id.* at 632–33. The trial judge warned the jurors that the determination of guilt or innocence could only be based on the evidence, dismissed the prospective juror for cause, and denied a mistrial. *Id.* The Ninth Circuit reversed the conviction. It viewed the error as structural given that the prejudicial statements "occurred before the trial had begun, resulted in the swearing in of a tainted jury, and severely infected the process from the very beginning." *Id.* at 633. It then concluded that "[t]he result of the trial . . . was principally dependant [sic] on whether the jury chose to believe the child or the defendant," that "[t]he extrinsic evidence was highly inflammatory and directly connected to Mach's guilt," and that reversal was warranted even under the harmless error standard. *Id.* at 634.

Respondents, by contrast, analogize the instant case to *Thompson v. Borg*, which characterized a prejudicial statement introduced during voir dire as trial error. 74 F.3d 1571, 1574 (9th Cir. 1996). Thompson had initially pleaded guilty to second degree murder, but then withdrew his plea. *Id.* at 1573. In response to questioning by defense counsel, a prospective juror indicated that he had read in a newspaper that Thompson had "pleaded guilty at one time and changed it." *Id.* The Ninth Circuit compared the extrinsic evidence to admission of an

involuntary confession, a classic trial error. *Id.* at 1574. The Ninth Circuit then held that the failure to grant a mistrial, if error at all, was harmless. *Id.* at 1575. In so doing, it relied on the following factors: (1) the trial judge's extensive consultation with counsel on how to cure the problem; (2) the trial judge's carefully worded admonition, which acted "to prevent jurors from drawing inferences from what the [prospective] juror had said, without reminding them of exactly what he had said;" (3) that defense counsel had created the problem; (4) that the prospective juror's remark did not indicate to what charge Thompson had initially pleaded guilty; (5) that Thompson's defense hinged on whether the stabbings were justified, not on whether or not he had committed them; and (6) the fact that the jury rejected the charge of first degree murder and seriously deliberated for more than two full days before finding Thompson guilty of second degree murder. *Id.* at 1575–76.

Even if the trial court erred in denying a mistrial in the instant case, the Court concludes that it is objectively reasonable to characterize the error as harmless trial error. First, the prospective juror's statement—"I'm a correctional officer at Dueul Vocational Institute. I would like to speak with you in your chambers because I believe I have come in contact with Mr. Craft."—is ambiguous. It gives no indication of when, where, and in what capacity the prospective juror met Craft. Her statement is thus susceptible to any number of interpretations. Admittedly, one such interpretation is that Craft was previously convicted of a felony. But given that the voir dire panel had been informed, at Craft's request, that he was in custody pending trial (*see* Lodged Doc. No. 16 at 142–43, 166–67), it is much more likely that the jurors simply assumed that the prospective juror recognized Craft from this pretrial incarceration. Second, the trial judge consulted extensively with counsel in considering a number of possible admonitions. (*See* Lodged Doc. No. 16 at 337–47.) Acceding to defense counsel's preference, the trial judge eventually settled on a general admonition that the fact of Craft's custody did not constitute evidence and could not be considered by the jury for any purpose. (*Id.* at 346–47.) Third, there is no direct connection, as there was in *Mach*, between the prejudicial statement and Craft's guilt in the instant case. Therefore, as in *Thompson*, "[t]he case is analogous to where a witness says something that was not supposed to be before the jury, the judge admonishes the

jury to disregard it, and there is no reason to doubt that the jury obeyed the admonition." *Id.* at 1576.

II.     Claim Four: Ineffective Assistance of Counsel

Craft claims that he suffered ineffective assistance of appellate counsel because the attorney representing him on appeal failed to appeal the issue of jury taint (Claim One).

A.      Procedural Default

Craft raised this ineffective assistance claim in two of his state habeas petitions.[2] The California Court of Appeal denied the claim without comment or citation to authority. (Lodged Doc. No. 8.)  The California Supreme Court then denied the same claim citing to *In re Clark*, 855 P.2d 729 (Cal. 1993), and *In re Miller*, 112 P.2d 10 (Cal. 1941).  (Lodged Doc. No. 12.)

In *Miller*, the California Supreme Court denied a habeas petition because a prior petition "was based on the same grounds set forth in the present petition" and "no change in the facts or the law substantially affecting the rights of the petitioner has been disclosed" in the interim.  112 P.2d at 10.  By invoking *Miller* in the second state habeas petition to invoke ineffective assistance, the California Supreme Court was in effect "denying the petition for the same reasons that it denied the previous one," *Kim v. Villalobos*, 799 F.2d 1317, 1319 n.1 (9th Cir. 1986), be it for substantive reasons, procedural reasons, or both.  *See also Karis v. Vasquez*, 828 F. Supp. 1449, 1457 (E.D. Cal. 1993)  (holding that a federal court will look through a state court's citation to *Miller* to the basis for decision in the first state petition).  Therefore, *Miller* merely maintains the status quo as to what occurred when the same claims were raised in the first state habeas petition, and does not act as a separate procedural bar to federal habeas review.  *See Ylst*, 501 U.S. at 804 n.3 ("Since a later state decision based upon ineligibility for further state review neither rests upon procedural default nor lifts a pre-existing procedural default, its effect on the availability of federal habeas is nil . . . .").

Accordingly, only the California Supreme Court's citation to *In re Clark* may provide a

---

[2] Although Craft did not raise this claim on direct appeal, the *Dixon* bar does not apply to claims of ineffective assistance.  *See Robbins*, 959 P.2d at 340 n.34 (so noting with respect to ineffective assistance of trial counsel).

-11-

basis for finding Craft's ineffective assistance of counsel claim procedurally barred. The citation to *In re Clark* could be an invocation of: (1) the bar on successive petitions, *see Robbins*, 959 P.2d at 322 n.9 ("*Clark* serves to notify habeas corpus litigants that we shall apply the successiveness rule when we are faced with a petitioner whose prior petition was filed after the date of finality of *Clark*."); (2) the bar on piecemeal claims, *see Clark*, 855 P.2d at 740 ("In this state a defendant is not permitted to try out his contentions piecemeal by successive proceedings attacking the validity of the judgment against him." (quotation omitted)); (3) the bar on untimely petitions, *see id.* at 738 ("It has long been required that a petitioner explain and justify any significant delay in seeking habeas corpus relief."); or (4) all of the above, *see id.* at 760 (noting that "the general rule is still that, absent justification for the failure to present all known claims in a single, timely petition for writ of habeas corpus, successive and/or untimely petitions will be summarily denied"). As it is unclear whether the California Supreme Court meant to invoke a procedural bar other than that on successive petitions, i.e., whether it cited *Clark* for a different reason than *Miller*, the Court exercises its discretion to decide Petitioner's claims on the merits. *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("We do not mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should be."); *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same.").

    B.    Merits

Clearly established federal law guides the Court's examination of ineffective assistance of counsel claims. *Delgado*, 223 F.3d at 980. Specifically, in order to establish ineffective assistance, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficient performance affected the result of the proceeding. *Strickland*, 466 U.S. at 687–88. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 689. A reasonable tactical decision by counsel with which the defendant disagrees cannot form a basis for an ineffective assistance of counsel claim. *See id.* at 689–90. In order to demonstrate prejudice, "[t]he

defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The Supreme Court defines "a reasonable probability" as a "probability sufficient to undermine confidence in the outcome." *Id.*

Moreover, federal habeas review of an ineffective assistance of counsel claim is "doubly deferential" under AEDPA. *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (per curiam). "If a state court has already rejected an ineffective-assistance claim, a federal court may [only] grant habeas relief if the decision was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Id.* at 5 (quoting 28 U.S.C. § 2254(d)(1)).

The *Strickland* standard also applies to claims of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000). Appellate counsel does not have a constitutional duty to raise every non-frivolous issue requested by a defendant. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Counsel "must be allowed to decide what issues are to be pressed;" otherwise, the ability of counsel to present the client's case in accord with counsel's professional evaluation would be "seriously undermine[d]." *Id.* There is, of course, no obligation to raise meritless arguments on a client's behalf. *See Strickland*, 466 U.S. at 687–88. In particular, "appellate counsel's failure to raise issues on direct appeal does not constitute ineffective assistance when appeal would not have provided grounds for reversal." *Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001).

As discussed in Claim One, *supra*, any error committed by the trial court in refusing to grant Craft a mistrial based on alleged jury bias was harmless. Because an appeal of this denial would not have provided grounds for a reversal of his conviction, Craft cannot establish ineffective assistance of appellate counsel based on failure to assert Claim One on direct appeal.

III.   *Claims Two and Three: Eyewitness Identifications*

Craft claims that the procedures whereby the victim and witnesses identified him as the perpetrator of the robbery were unduly suggestive and violated his right to due process.

//

*A.     Legal Standard*

Due process protects against the admission of evidence deriving from suggestive pretrial identification procedures. *Neil v. Biggers*, 409 U.S. 188, 196–97 (1972). In a habeas action, a federal court applies a two-step analysis to evaluate a petitioner's challenge to pretrial and subsequent in-court identifications. *United States v. Givens*, 767 F.2d 574, 581 (9th Cir. 1985). The first step is to determine whether the underlying pretrial identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). This may occur when the procedure "emphasize[s] the focus upon a single individual." *United States v. Bagley*, 772 F.2d 482, 493 (9th Cir. 1985) (citations omitted); *see also Simmons*, 390 U.S. at 383 ("This danger [of misidentification] will be increased if the police display to the witness . . . the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized."). Second, even if the pretrial identification procedure was impermissibly suggestive, the court must decide whether, under the totality of the circumstances, the identification was nonetheless reliable. *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977); *Neil*, 409 U.S. at 198–200. The factors to be considered in determining reliability are: (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Neil*, 409 U.S. at 199–200. Even if the pretrial identification procedure was impermissibly suggestive and the identification was unreliable, harmless error analysis applies. *Foster v. California*, 394 U.S. 440, 444 (1969) (remanding a challenge to an in-court identification for harmless error analysis); *United States v. Wade*, 388 U.S. 218, 242 (1967) (same).

*B.     Claim Three: Photographic Montage Identification*

Craft contends that he was denied due process by virtue of an unduly suggestive pretrial photographic montage, and on this basis seeks to exclude both the pretrial and in-court identifications made by Yobana and Lillian Campuzano. However, the California Court of

-14-

Appeal's denial of Craft's claim was not "contrary to" clearly established federal law under 28 U.S.C. § 2254(d)(1). The Court of Appeal held that Craft must show the identification was unduly suggestive as well as unreliable under the totality of the circumstances. Nor did the Court of Appeal "unreasonably" apply federal law in denying Craft's claim.

### 1.   *Suggestiveness*

Craft argues that the photographic montage from which the Campuzano sisters each identified him was unduly suggestive. Specifically, Craft claims that his photograph stood out from the remaining five photographs for two reasons: (1) only Craft's photograph had a pure white background; and (2) only Craft was wearing clothing—a black t-shirt with red trim at the collar—matching the description of the perpetrator's clothing given by the Campuzano sisters. The Court addresses each argument in turn.

First, with respect to Craft's challenge to the white background of his photograph, the California Court of Appeal concluded:

> The background of the five other pictures included in the lineup varies in color from dark gray to light gray. Only defendant's picture has a pure white background except for an area next to the left side of his neck. However, a difference in the color of the background does not in and of itself render a lineup suggestive. Moreover, defendant does not point to any evidence here that would support the conclusion that the white background was unduly suggestive to the Campuzanos. Although defendant cross-examined the witnesses about the details of the bases for their selection of him out of the lineup, both during the preliminary hearing and the trial, the testimony of the Campuzanos does not support an inference that they found the background color at all suggestive. At the preliminary hearing, when asked if the backgrounds of the photos were the same, the Campuzanos both said they did not remember. Indeed, in moving to exclude their identifications of him, defendant did not argue that the background made his photograph stand out; instead, he contended the clothing was the "one factor alone [that] created an unnecessarily suggestive procedure."
> Absent any evidence suggesting the background of his photograph made him stand out from the others, we conclude this aspect of defendant's argument is unsupported.

(Lodged Doc. No. 4 at 7–8 (internal citations omitted) (alteration in original).) Having reviewed a color copy of the same photographic montage examined by the Campuzano sisters, this Court agrees with the Court of Appeal. The backgrounds are uniformly monochrome. No one photograph stands out more than the others given that each background is at a different point on the spectrum between white and black. *See Mitchell v. Goldsmith*, 878 F.2d 319, 323 (9th Cir.

1989). Nor does the testimony from either Yobana or Lillian Campuzano indicate that the background color of the photographs in any way influenced their positive identifications of Craft as the robber. (*See* Lodged Doc. No. 13 at 99, 140.)

In reviewing Craft's challenge to how the suspects in the photographic montage were clothed, the California Court of Appeal considered the totality of the circumstances surrounding the Campuzano sisters' identification of Craft as the perpetrator. (Lodged Doc. No. 4 at 9–16.) The Court of Appeal concluded that the trial court's findings that Yobana and Lillian identified Craft in the photographic montage based primarily on facial features rather than clothing is supported by substantial evidence. (*Id.* at 10–11, 15.) The Court of Appeal reasoned:

> During the preliminary hearing and the trial, Yobana stated that although she noticed the black T-shirt with the red collar, she relied on the facial features to make the selection. She described the time she took and how she was able to eliminate three persons from the lineup based on their faces and their age. In fact, despite noticing defendant's clothing, she "stared" at all six pictures for about five minutes, and only through a process of elimination by looking at their facial features did she make the final selection. In addition, she knew she was not obligated to make a selection, and thus there was no pressure to find the person with the specific clothing was the perpetrator.
> . . . .
> Lillian knew the perpetrator might not be in the lineup, and she knew she was not obligated to pick anyone. Furthermore, she had multiple opportunities to see his face, not only inside but also outside in the parking lot and behind the Alpine Market. During the lineup identification, Lillian was able to eliminate three or four pictures based on their facial features and their age. Despite the fact that she recognized the particular clothing she saw on the perpetrator, it took her about 10 minutes to make the final selection, and the process she used was a process of elimination not based solely on the presence of the clothing.

(*Id.* at 11, 15.) This Court has examined the photographic montage admitted into evidence and agrees that Craft is the only person in the montage wearing a black t-shirt, let alone a black t-shirt with red trim around the collar. The record does not reveal why police used what may have been Craft's booking photo on the day of his arrest showing him wearing the outfit described by the witnesses. A better practice clearly would have been to select for the montage persons photographed wearing the same or similar clothing. Alternatively, the photograph could have been cropped at the shoulder line to avoid showing any clothing at all. Had this Court been reviewing the montage on direct appeal in a federal criminal prosecution, its determination might have been different. However, although this is admittedly a closer question than the

challenge to the background color, this Court cannot conclude that the California Court of Appeal unreasonably applied federal law in determining that Craft's distinctive attire did not make the photographic montage unduly suggestive.  The state courts found the testimony of the Campuzano sisters credible, and Craft has not rebutted the presumption of correctness Congress has directed, through AEDPA, that this Court must accord to that finding.  *See* 28 U.S.C. § 2254(e)(1).  Based on the factual determination that their testimony was credible, it was not objectively unreasonable for the state courts to conclude that the Campuzano sisters did not simply "settle" for the one individual in the photographic montage whose clothing matched that of the perpetrator.  Rather, credible evidence shows that the sisters carefully and methodically examined the facial features of the six suspects before identifying Craft as the perpetrator.  Even though Craft's clothing may have contributed to the certainty of the sisters' identifications, the photographic montage was not "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons*, 390 U.S. at 384.

    2.  *Reliability*

    Craft further argues that the Campuzano sisters' identifications were unreliable under the totality of the circumstances.  He claims that neither woman had the opportunity or clarity of mind to adequately observe the perpetrator's facial features, that their descriptions of the suspect were vague and failed to include aspects of Craft's appearance upon arrest, and that any certainty in their identifications of Craft was undermined by their admitted reliance on Craft's distinctive clothing in the photographic montage.

    As the California Court of Appeal did not reach the question of reliability, the Court will undertake an "independent review" of the record.  *See Pirtle*, 313 F.3d at 1167.  Contrary to Craft's contentions, the totality of the circumstances indicates that the Campuzano sisters' identifications were reliable.  Upon leaving the bathroom where he attacked Acosta, the robber looked directly at the two women. (Lodged Doc. No. 13 at 69, 115; Lodged Doc. No. 15 at 136, 189, 194.)  Lillian followed the robber outside and continued to watch him from a distance for several minutes. (Lodged Doc. No. 13 at 116–17; Lodged Doc. No. 15 at 196–200.)  As both women approached the bathroom with the suspicion that someone was either being robbed or

having a heart attack, it is proper to infer that they were paying attention to their surroundings. (Lodged Doc. No. 13 at 66–67, 112.) The sisters described the robber to the police as a black man in his mid-thirties to early-forties, wearing blue jeans, a black t-shirt with red trim around the collar, and a black baseball cap. (*Id.* at 68, 87–89, 128–30, 136; Lodged Doc. No. 15 at 135–36, 189.) These descriptions were generally accurate, omitting only Craft's closely cropped facial hair and yellow writing on the front of his shirt. Both women expressed a high level of certainty in their in-court identifications—Yobana indicated she was 99 percent certain that Craft was the robber, and Lillian indicated that she was between 85 and 90 percent certain. (Lodged Doc. No. 13 at 104, 141–42.) Although Craft's clothing factored into their decisions, both women carefully scrutinized the suspects' facial features before identifying Craft. Finally, only two months elapsed between the robbery and the preliminary hearing at which the Campuzano sisters made their first in-court identification of Craft. Therefore, even if the pretrial photographic montage was impermissibly suggestive, under the totality of the circumstances, application of the *Neil* factors indicates that the identifications of Craft by Yobana and Lillian Campuzano were nonetheless reliable.

   C.  Claim Two: Showup Identification

   Craft claims that he was denied due process by virtue of an unduly suggestive pretrial showup identification, and on this basis seeks to exclude both the pretrial and in-court identifications made by victim Bolivar Acosta. He contends that the showup is improper under *Stovall v. Denno*, 388 U.S. 293 (1967), because not justified by any exigency. He also argues that Acosta's identification was unreliable under the totality of the circumstances given that: (1) at the time Acosta saw the perpetrator he was not wearing his eyeglasses and had been washing his face; (2) Acosta's description of the perpetrator was vague; (3) the certainty of Acosta's identification of Craft was undermined by allegedly suggestive techniques used by the police in conducting the showup; and (4) Acosta based his identification solely on Craft's attire. On direct review, the California Court of Appeal declined to address the constitutionality of Acosta's showup and in-court identifications, finding instead that their admission, even if erroneous, was harmless. (Lodged Doc. No. 4 at 16–17.)

This Court agrees that, even if Acosta's showup identification was unduly suggestive and unreliable, admission of his pretrial and in-court identifications of Craft would at most constitute harmless error. As the California Court of Appeal aptly explained:

> Here, independent of Bolivar, the Campuzanos reliably identified defendant as the perpetrator. The two sisters both observed defendant walk out of the bathroom, they both saw his face and observed his facial features, his clothes and general features, and they both independently were able to recall those features, describe them to the police, and subsequently identify defendant as the assailant with a high degree of certainty.
> In addition, the evidence showed that defendant, who matched the description of the assailant, was found hiding nearby in possession of the stolen watch. At the time of his arrest, even before defendant was told he was suspected of robbery, he blurted out that he did not rob anybody and then immediately offered a patently incredible explanation of how he happened to be in possession of the stolen watch and why he was hiding in the bushes in someone's backyard.
> Furthermore, the jury was instructed pursuant to CALJIC No. 2.92 on the various factors to be considered in determining the weight to be given eyewitness identification testimony. Also, the jury heard the testimony of a defense expert on the subjects of human perception, memory, and eyewitness identification, including cross-racial identification.
> Given that Bolivar had only one or two seconds without his glasses to see defendant, and given the testimony of the defense expert and the jury instruction on eyewitness identification, we are convinced the jury gave little if any weight to Bolivar's identification of defendant. Rather, we believe that in reaching its verdict, the jury relied on the strong identifications given by the Campuzanos and defendant's incredible explanation of why he was found hiding in the bushes with the stolen watch.

(Lodged Doc. No. 4 at 17–18.) Given this strong corroborative evidence of Craft's guilt, the Court cannot find on habeas review that Acosta's identifications "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (quoting *Kotteakos*, 328 U.S. at 776).

Therefore, the state court decision rejecting Craft's challenge to Acosta's identifications was not contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence in the record before this Court.

1  Therefore, it is hereby

2  **ORDERED** that Craft's petition for a writ of habeas corpus pursuant to 28 U.S.C.
3  § 2254 is **DISMISSED IN PART** and **DENIED IN PART**.  The case is **DISMISSED** with
4  prejudice.

5  The Clerk is directed to enter the accompanying Judgment and to send uncertified copies
6  of this Order and the Judgment to all counsel of record and to any party appearing *pro se* at said
7  party's last known address.

8  DATED this 22nd day of October, 2009.

```
                    /s/ Richard C. Tallman
                    UNITED STATES CIRCUIT JUDGE
                    Sitting by designation
```